**James H. Kaster\*** (MN #53946)
kaster@nka.com
**David Schlesinger** (AZ #025224)
schlesinger@nka.com
**Lucas J. Kaster\*** (MN #396251)
lkaster@nka.com
NICHOLS KASTER, PLLP
4700 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Tel: (612) 256-3200

**Anthony S. Petru\*** (CA #91399)
petru@hmnlaw.com
**Gavin Barney\*** (OR #163382, CA #321880)
barney@hmnlaw.com
HILDEBRAND MCLEOD & NELSON
350 Frank H. Ogawa Plaza, 4th Floor
Oakland, CA 94612
Tel: (510) 451-6732

*admitted pro hac vice*

Attorneys for Plaintiff James Blankinship

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

TUCSON DIVISION

| | |
|---|---|
| James Blankinship, <br><br> Plaintiff, <br><br> v. <br><br> Union Pacific Railroad Company, a Delaware Corporation, <br><br> Defendant. | Case No. 4:21-cv-00072-RM <br><br> **PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

## I.    <u>INTRODUCTION</u>

Plaintiff James Blankinship opposes Defendant Union Pacific Railroad Company's Motion for Summary Judgment for the reasons explained herein.

Blankinship, who worked 10 years for Union Pacific as a conductor, was removed from service and placed into Union Pacific's Fitness-for-Duty policy following a failed

clinical color vision test as part of his normal certification process. Union Pacific then assessed Blankinship's vision using a device called a Light Cannon. The Light Cannon test is proprietary to Union Pacific and has not been properly validated. Based on the results of the Light Cannon test, Union Pacific issued Blankinship permanent work restrictions, which, it claimed, could not be accommodated. Based on the application of the Union Pacific rules, Blankinship alleges claims for disability discrimination and unlawful screening.

Because issues of fact exist as to each of Blankinship's claims, Union Pacific's motion for summary judgment fails. As a preliminary matter, Blankinship was unequivocally a member of the putative class action in *Harris v. Union Pacific*, and as such his claims were tolled during the pendency of that class action under *American Pipe*. Substantively, each of Blankinship's claims raise triable issues of fact for the jury that preclude summary judgment.

First, Union Pacific's decision to remove Blankinship from service and the Fitness-for-Duty policies under which it denied him FRA certification were based on Blankinship's real or perceived disability and are therefore facially discriminatory. Defendant relied on its determination that Blankinship has a "color vision deficit" in issuing him permanent work restrictions. The *McDonell Douglas* burden shifting analysis, therefore, is inapplicable.

Second, a jury could reasonably find that the Union Pacific Light Cannon test failed to meet FRA validation requirements and, therefore, that Union Pacific's qualification standards are neither mandated by federal regulation nor work related. As such, Blankinship can show that he was a qualified individual with a disability under the Americans with Disabilities Act, and can establish the *prima facie* elements of his discrimination claims.

Third, because Union Pacific relies on affirmative defenses in seeking summary judgment on Blankinship's disability discrimination and unlawful screening claims, the

1   company bears the burden of proving its defenses at trial and bears a heightened burden at

2   summary judgement. Union Pacific cannot carry this burden: Union Pacific's evidence is

3   grossly insufficient to prove, as a matter of law, that Blankinship's removal subject to

4   Union Pacific's fitness-for-duty policies and Light Cannon color-vision test was

5   "consistent with business necessity."

6          Given the substantial issues of fact in this case, summary judgment should be denied

7   on all three claims and Blankinship's case should proceed to a jury.

8                          II.      <u>ARGUMENT</u>

9   **A. SUMMARY JUDGEMENT STANDARD**

10         Summary judgment is appropriate only where "there is no genuine dispute as to any

11  material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

12  56(a). The burden is on the moving party to demonstrate the absence of a material factual

13  dispute. *Celotex Corp. vs. Cartrett*, 477 U.S. 317, 323 (1986). The Court must construe the

14  evidence in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372,

15  378 (2007); *Barlow v. Ground*, 943 F.2d 1132, 1134 (9th Cir. 2001). Summary judgment

16  is a drastic remedy, and much be approached with caution. *Anderson v. Liberty Lobby, Inc.*,

17  477 U.S. 242, 255 (1986); *Consolidated Elec. Co. v. U.S. for Use and Benefit of Gough*

18  *Industries, Inc.*, 355 F.2d 437, 438 (9th Cir. 1966).

19         "[T]he plaintiff in an employment discrimination action need produce very little

20  evidence in order to overcome an employer's motion for summary judgment." *Santillan v.*

21  *USA Waste of California*, 853 F.3d 1036, 1042 (9th Cir. 2017) (citation omitted). The Ninth

22  Circuit has set a high standard for summary judgment in employment cases because the

23  ultimate question of discrimination "is one that can only be resolved through a searching

24  inquiry—one that is most appropriately conducted by a factfinder, upon a full record."

25  *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (internal quotation

26  marks omitted); *see also Mays v. United Ass'n Loc. 290 Apprenticeship & Journeymen*

27

28

1  *Training Tr. Fund*, 407 F. Supp. 3d 1121, 1143 (D. Or. 2019) ("[s]ummary judgment is
2  disfavored in employment discrimination cases.").

3      Importantly, the standard is *even higher* as to the affirmative defenses upon which
4  Union Pacific relies. "Where the moving party will have the burden of proof on an issue at
5  trial, the movant must affirmatively demonstrate that *no reasonable trier of fact could find*
6  *other than for the moving party*." *Soremekun v, Thrifty Payless, Inc.,* 509 F.3d 978, 984
7  (9th Cir. 2007) (emphasis added); *Altman v. HO Sports Co.*, 821 F. Supp. 2d 1178, 1186
8  (E.D. Cal. 2011).

9  **B. PLAINTIFF'S CLAIMS WERE TOLLED UNDER *AMERICAN PIPE* AND**
10 **WERE THEREFORE TIMELY.**

11     **1.   Plaintiff was Unequivocally a Member of the Putative Class in Harris**
12        **and His Claims are Therefore Timely.**

13     Under *American Pipe* the timely filing of a class action tolls the running of the
14 applicable statue of limitations for putative class members' claims until a decision is
15 reached whether to certify the class. *American Pipe & Const. Co. v. Utah*, 414 U.S. 538,
16 539 (1974); *Crown, Cork & Seal Co. Inc. v. Parker*, 462 U.S. 345, 350 (1983) ("While
17 *American Pipe* concerned intervenors, we conclude that the holding of that case is not to
18 be read so narrowly. This filing of a class action tolls the statute of limitations to all asserted
19 members of the class, not just intervenors."). The basis for the *American Pipe* rule is that
20 the class action filing provides a defendant notice of the "substantive claims being brought
21 against them," along with "the number and generic identities of the potential plaintiffs who
22 may participate in the judgment." *American Pipe*, 414 U.S. at 555. In other words, class
23 action tolling is consistent with the purposes behind statutes of limitation, which prevent
24 surprise assertions of belated claims, by which time "evidence has been lost, memories
25 have faded, and witnesses have disappeared." *Id.* at 554. The rule also promotes the
26 interests of litigative efficiency and judicial economy at the heart of class action litigation.
27 *Id.* at 555-56. Tolling during the pendency of a class action certification prevents the need
28 for a plaintiff to file redundant independent suits while awaiting a decision concerning

4

1    certification in order to avoid their claims becoming time barred. *Id.* at 553-54; *see also*

2    *Aguilar v. Ocwen Loan Servicing, LLC*, No. 3:17-cv-1165-B, 2018 U.S. Dist. LEXIS

3    26288, at *10 (N.D. Tex. Feb. 20, 2018) ("[I]f the statute of limitations for a putative class

4    member's claim continued to run after the filing of a class action, putative class members

5    could not count on class actions to protect their rights . . . Putative members would need to

6    intervene to protect their claims. The result would be a needless multiplicity of protective

7    actions, which was what Rule 23 what designed to prevent.") (internal citations omitted).

8    Because of the notice provided by the filing of a class action, a defendant can make efforts

9    to preserve evidence, and "the imposition of a time bar would not [] promote the purposes

10   of the statues of limitations," making tolling "consistent with both the procedures of Rule

11   23 and with the proper function of the limitations statute." *American Pipe*, 414 U.S. at 555.

12        Union Pacific argues that Blankinship's claims do not receive the benefit of tolling

13   under *American Pipe* because, when the *Harris* class action plaintiffs sought to certify the

14   class against Union Pacific, individuals removed from service by Defendant for color

15   vision deficiency and failure to pass the Light Cannon test were omitted from the class

16   definition. This is simply false.

17        First, the *Harris* class action certification refers to color vision plaintiffs among

18   the class. (PSSF 44.) The Amended Class Action complaint included all adverse

19   employment actions "related to a Fitness-for-Duty evaluation," thereby including

20   individuals subject to color vision testing under the FFD protocols within the class. (PSSF

21   43.) In arguing that Union Pacific's Fitness-for-Duty and Reportable Health Events

22   Policies lack a valid rationale it their class certification briefing, the putative class plaintiffs

23   explicitly continued to include color vision plaintiffs within the class via numerous

24   references to Union Pacific's color vision testing policies. The briefing listed Dr. Jay Neitz

25   as an ophthalmology expert retained to "address the validity of Union Pacific's vision

26   requirements." (PSSF 44.)[1] This alone establishes that, at the time of class certification,

27

28
_____

[1] Dr. Neitz has been retained by Blankinship as an expert witness in this case as well.

1    individuals removed from service following a light cannon test were intended to be
2    included among the class, and, as such, this case is readily distinguishable from the caselaw
3    relied upon by Union Pacific.

4           Further, while Union Pacific here points to the term "reportable health event" in
5    the class definition and argues that it has a narrow meaning defined within the Union
6    Pacific medical rules, the class certification briefing severely undercuts this rigid
7    interpretation of the term. Specifically, the *Harris* class plaintiffs noted that Union Pacific
8    interchangeably used the terms "reportable health event" and "reportable health condition,"
9    and thereby made it clear that the class certification was not intended to be limited to cases
10   involving discrete medical "events" such as cardiac events or strokes. (PSSF 45.)

11          In *Sawtell v. E.I. du Pont de Nemours & Co.,* the Tenth Circuit denied plaintiff, a
12   New Mexico resident, the benefit of *American Pipe* tolling following the decertification of
13   a class action filed in Minnesota. 22 F.3d 248, 253-54 (10th Cir. 1994). There, the plaintiffs
14   in the underlying class action claims each moved to certify their class, and in doing so
15   clarified that the classes consisted solely of individuals whose cases arose out of
16   Minnesota. *Id.* at 253. However, the court determined that the evidence before it made clear
17   that the class was *never intended* to include anyone other than Minnesota residents: each
18   of the cases was filed in Minnesota state court pursuant to Minnesota class action law and
19   the complaints did not specify a national class. *Id.* Similarly, in *Smith v. Pennington*, the
20   Fourth Circuit's denied tolling under *American Pipe* where the class plaintiff "moves for
21   class certification by asserting an *unambiguous* definition of his desired class that is more
22   narrow than is arguable dictated by his complaint." 352 F.3d 884, 894 (4th Cir.
23   2003)(emphasis added). The Ninth Circuit has not adopted either of the rules articulated in
24   *Sawtell* or *Smith*, but even if it had, the *Harris* plaintiffs' clear intention to include
25   individuals like Blankinship within the certified class would require that *American Pipe*
26   tolling apply in this case. Indeed, reference to not only Union Pacific's color vision
27   policies, but to the Light Cannon test itself mean that the *Harris* class certification briefing

28

MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1   hardly asserts an "unambiguous definition" removing plaintiffs like Blankinship from the
2   class. (PSSF 44-45.)

3       Second, this specific issue was raised in the *Harris* litigation, and the court there
4   found, unequivocally, that the *Harris* class action included individuals removed from
5   service under Union Pacific's Fitness-for-Duty policy and following a light cannon test.
6   (PSSF 46.) There, Union Pacific sought a protective order shielding it from all future
7   discovery relating to the railroad's color vision testing. (PSSF 46.) In denying Union
8   Pacific's motion, District Judge Joseph Battalion held that the "allegations made by the
9   plaintiffs clearly encompass vision testing as it is included in the FFD program." (PSSF
10  46.) Crucially, Judge Battalion's order was issued on February 1, 2019 – nearly six months
11  after the class plaintiffs supposedly narrowed the class to exclude color vision cases like
12  Blankinship's.

13      Because color vision cases were always a part of the *Harris* class action alleging
14  violations of the ADA through Defendant's Fitness-for-Duty policy, the *Harris* class action
15  plaintiffs did not remove those cases from the class action through the filing of its Motion
16  for Class Certification. *American Pipe* tolling, therefore, applies.

17          **2.  Plaintiff's Disparate Impact Claim is Tolled**

18      Union Pacific advocates an extremely narrow and restrictive interpretation of class
19  action tolling under *American Pipe*, and one that is unsupported by any Ninth Circuit
20  caselaw, to argue that Blankinship's Disparate Impact cause of action is not subject to
21  tolling. Courts have applied two distinct rules concerning the scope of class action tolling
22  under *American Pipe* and *Crown, Cork.* While many courts – including court in the Ninth
23  Circuit – have held that the proper analysis for class action tolling is whether the claims in
24  the class action complaint share a common factual and legal nexus with subsequent
25  individual claims, other courts have applied a narrower rule extending tolling only where
26  there is identity of claims between the class action and subsequent cases. *Compare Tosti v.*
27  *City of Los Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1984) (tolling applied to a different

28

claim because the class suit involved the same allegations and "[t]he City had ample notice of the nature of Tosti's discrimination claims.") *with Williams v. Boeing Co.*, 517 F.3d 1120, 1136 (9th Cir. 2008) (denying tolling for peripheral claims not alleged in the class Complaint or Amended Complaint).

However, under either rule, the notice provided to the defendant by the class action filings is the basis for tolling and the primary consideration before the court. *See Williams*, 517 F.3d at 1136 ("Tolling is fair in such a case because when the complaint is filed defendants have notice of the 'substantive claims being brought against them.") *citing Crown, Cork & Seal Co.,* 462 U.S. at 352-53. As such, the Court need not decide between either interpretation of *American Pipe* and *Crown, Cork* to find that Blankinship's Disparate Impact claim was tolled, because Plaintiff here brings the exact same claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), as those alleged by the named and unnamed plaintiffs in *Harris*. In his complaint, Blankinship asserts that Union Pacific unlawfully screened him due to this alleged disability in violation of 42 U.S.C. § 12112(a) and (b)(6) by, (a) imposing "fitness for duty policies, including its use of the Light Cannon test, [that] disproportionately and adversely impact qualified individuals with disabilities; (b) . . . us[ing] qualification standards that screen out or tend to screen out qualified individuals with disabilities; and (c) . . . us[ing] a Fitness-for-Duty evaluation process that screens out or tends to screen out qualified individuals with disabilities" These are functionally identical to the claims that were previously asserted in the *Harris* class action on a class-wide basis, both as disparate treatment and disparate impact. Namely, both complaints allege that Union Pacific engaged in disability discrimination through its Fitness-for-Duty program, under which it unlawfully removed individuals with real or perceived disabilities from service and issued them permanent and unnecessary work restrictions. As here, the *Harris* Complaint alleged that the application of Union Pacific's Fitness-for-Duty policies "disproportionately – and adversely – impact qualified individuals with disabilities" and use "qualification standards that screen out and

tend to screen out individuals with disabilities" in violation of 42 U.S.C. § 12112(b)(6). These allegations were raised on the behalf of both the named and unnamed plaintiffs. Because the same disparate impact claims were alleged in both the class and subsequent litigation, Union Pacific cannot suggest that it lacked notice of the subject matter of prospective litigation during the pendency of the *Harris* class action. See American Pipe, 414 U.S. at 555.

Despite Plaintiff's disparate impact cause of action being identical to that alleged on a class wide basis in *Harris*, Union Pacific argues that tolling for the claim was suspended in 2018 after the Harris plaintiffs sought to narrow the issue before the District of Nebraska and moved to certify the class on disparate treatment alone. The suggestion that this had the effect of removing the claim from tolling flies in the face of the purpose behind class action tolling and is unsupported by Ninth Circuit caselaw. Courts have looked to the claims *raised* in the class action and whether those claims provide the necessary notice, not whether the subsequent claims were included in the final class certification. *Williams*, 517 F.3d at 1136; *Renati v. Wal-Mart Stores, Inc.*, 2019 U.S. Dist. LEXIS 185486, *41 (N.D. Cal. Oct. 25, 2019) ("Courts are more likely to find that <u>American Pipe</u> tolling applies when later claims assert the same legal theories as the class complaint, even if they are based on somewhat different factual allegations"). As the court clarified in *Williams*, the "commencement of a class action itself, not the class certification decision, suspends the statute of limitation as to all asserted member of the class. . ." 517 F.3d at 1136.

To support its exceedingly narrow interpretation of class action tolling, Union Pacific relies primarily on a recent decision in a related suit filed in the Fifth Circuit: *Carrillo v. Union Pacific R.R. Co.*, EP-21-CV-00026-FM, 2021 U.S. Dist. LEXIS 133087 (W.D. Tex., July 16, 2021). There, the court noted that certain events, including denial of certification or class decertification have the effect of triggering an end to tolling under *American Pipe*. *Id*. at * 11. In doing so, the court equated the decision to certify only on

MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

certain causes of action – or as the court puts it, to "voluntarily abandon" the disparate impact claim – with the functional effect of decertification. *Id*. at 12-13. However, in coming to this conclusion, the Carrillo court largely ignored the fact that the *Harris* class complaint had provided Union Pacific with ample notice of the class members' disparate impact causes of action, and instead relied almost exclusively on the Fifth Circuit's ruling in *Hall v. Variable Annuity Life Insurance Co*., 727 F.3d 372 (5th Cir. 2013). *Hall* concerned a class action lawsuit alleging securities fraud in which the class plaintiffs failed to disclose any expert or fact witnesses prior to the disclosure deadline. *Id*. at 374. The court ultimately granted the defendant's motion to strike after the class plaintiffs eventually filed witness lists, and, after determining that the class plaintiffs would be unable to prove class wide damages, the court vacated its previous grant of class certification. *Id*. When the plaintiffs in *Hall* filed a subsequent case over five years later, the court refused to find that the applicable statute of repose had continued to be tolled following the vacatur of certification in the previous suit. *Id*. at 375. The court ultimately held that vacating an order of class certification is equivalent to denying certification or decertifying a class. *Id*.

The *Carrillo* court's reliance on *Hall* was unfounded and, as such, its order was ultimately wrongly decided. While in *Hall* the decision to vacate class certification had the effect of entirely resolving the class action, here, the question of class certification remained an open one until the Eighth Circuit ultimately decertified the *Harris* class in 2020. As such, the predecessor court's decision in *Hall* to vacate certification is readily distinguishable from the *Harris* plaintiffs' certification of the disparate treatment cause of action. Crucially, Blankinship did not cease being a class member when the proposed *Harris* class definition was narrowed. As the *Hall* court explained, "[o]nce the district court denies certification or decertifies a class, the putative class members ha[ve] no reason to assume that their rights are being protected." *Id*. at 376 (internal citations omitted). Here, the *Harris* class action as a whole was still pending, and Blankinship had no reason to assume that his rights were no longer protected as to only part of his claims.

MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

*Fullbright,* in which the court relied heavily on the *Carillo* holding, is similarly wrongly decided and inapplicable in this case. Because the *Harris* class action provided Defendant notice of Blankinship's disparate treatment *and* disparate impact claims, both of Blankinship's causes of action were subject to tolling under *American Pipe.*

## C. FACT ISSUES PRECLUDE JUDGEMENT ON PLAINTIFF'S DISPARATE TREATMENT CLAIM.

The Americans with Disabilities Act ("ADA") prohibits covered employees from "discriminat[ing] against a qualified individual on the basis of disability in regards to [] discharge of employees, [and] other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). This includes a prohibition on "using qualification standards, employment tests of other selection criteria that screen out or tend to screen out an individual with a disability[.]" 42 U.S.C. § 12112(b)(6). Qualification standards include "medical, safety and other requirements established by [an employer] as requirements [] to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q).

### 1. Defendant's Color Vision Fitness-For-Duty Policy is Facially Discriminatory.

Union Pacific has a facially discriminatory policy of excluding workers based on disability, i.e. color vision deficiency that interferes with their ability to pass color vision tests. *See Bates v. UPS,* 511 F.3d 974, 988 (9th Cir. 2007) (finding that the policy at issue was "a *facially discriminatory* qualification standard because it focus[ed] directly on an individual's disabling or potentially disabling condition") (emphasis in original). Plaintiff can establish that Union Pacific discriminated against him on the basis of disability when it identified him as having condition it deems disqualifying and issued him permanent work restrictions that rendered Plaintiff unable to return to work. (PSSF 40-42.)

Because Union Pacific concluded that Plaintiff had color vision deficits and then relied on that determination as a basis to deny him certification and issue him permanent work restrictions, (PSSF 40-42), the framework of *McDonnell-Douglas* is not applicable. *See Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121 (1985) ("[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination");

*Bates v. UPS,* 511 F.3d 974, (holding a "burden-shifting protocol" is unnecessary when it is undisputed that an employer made an employment decision on a proscribed basis, i.e. on the basis of disability); *See also Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1182 (6th Cir. 1996) *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp, Inc.*, 681 F.3d 312 (6th Cir. 2012) ("The *McDonnel Douglas* burden shifting approach is unnecessary because the issue of the employer's intent, the issue for which *McDonnell Douglas* was designed, has been admitted by the defendant[.]") Contrary to Defendant's assertion, Plaintiff need not show that Defendant's reason for denying his certification and issuing him workplace restrictions was pretextual. Union Pacific's reason for removing Plaintiff from service does not constitute a valid nondiscriminatory explanation, nor does it disclaim any reliance on Plaintiff's perceived disability. *Dark v. Curry* Cty., 451 F.3d 1078, 1084 (9th Cir. 2006).

Union Pacific argues that its sole reason for denying Blankinship certification and removing him from service permanently was its "obligation to comply" with FRA regulations and that it was Blankinship's failure to pass color vision tests, rather than his disability, that resulted in his removal. The railroad here seeks to draw a distinction without a difference, but it cannot credibly argue that its policies concerning testing for color vision are entirely divorced from the condition that the tests are intended to identify. Union Pacific's policy mandates that, where an employee fails an Ishihara color vision screening test, they are removed from service as a part of the company's fitness for duty program and must take Union Pacific's proprietary Light Cannon test. (DSSF 40, PSSF 40-42) Each of the vision tests Union Pacific assesses are designed to detect color vision deficiency. (PSSF 40-42) Whether or not Union Pacific is required to assess color vision tests by the FRA, this process undoubtedly "focuses on an individual's disabling or potentially disabling condition." *See Bates,* 511 F.3d at 988; *see also McGregor v. AMTRAK*, 187 F.3d 1113, 1116 (9th Cir. 1999) (holding that a policy requiring employees to be "100% healed" or "fully healed" after an injury is facially discriminatory and constitutes a *per se* violation of

MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

the ADA).

More importantly, however, Plaintiff can further show direct evidence that Union Pacific acknowledged on numerous occasions that Blankinship was denied certification and removed from service as a result of his "color vision deficit" or his "inability to discern colored signals." (PSSF 40-42.) Because Union Pacific's reason for issuing Blankinship workplace restriction and removing him from service does not "disclaim[] any reliance on [Blankinship's] disability," as a matter of law, Defendant's stated reason fails to qualify as a legitimate, nondiscriminatory explanation. *Dark,* 451 F.3d at 1084.

However, even if Plaintiff did bear the burden of demonstrating that Union Pacific's argued reason for removing him from service – i.e. that Union Pacific was obligated to decertify Blankinship – given Union Pacific's reliance on Blankinship's supposed color vision deficit in issuing him workplace restrictons, a jury could reasonably determine that his disability was a motivating factor in his removal. *Dark,* 451 F.3d at 1083, 1085 (finding that, although the defendant employer cited misconduct as the reason for plaintiff's termination, its reference to plaintiff's medical condition in its explanation of termination was sufficient evidence that a jury could reasonably determine that the stated justification was pretextual).

## 2. <u>Plaintiff is a Qualified Individual with a Disability Under the Statute</u>

The ADA applies to qualified individuals with disabilities, and defines "disability as (a) physical or mental impairment that impairs one or more major life activities; (b) a record of such impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(1). An individual is "regarded as having" an impairment if they are subjected to an action prohibited under the ADA "because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(1)(C). Defendant does not dispute at this stage that Plaintiff is a person with a disability under the ADA as it pertains to Plaintiff's allegation of disparate treatment. Rather, Defendant disputes that Plaintiff was a qualified individual

under the statute.

In the Ninth Circuit, "Qualification" is a two-step inquiry. At trial Blankinship must show: (1) that he satisfies the "requisite skill, experience, education and other job-related requirements" of the conductor position; and (2) that he can "perform the essential functions of such position with or without a reasonable accommodation." *Bates v. UPS*, 511 F.3d 974, 990 (9th Cir. 2007) (internal citations and quotation marks omitted).

Concerning the first inquiry, Union Pacific does not appear to contest that Blankinship satisfies the requisite skill, experience, and education for the conductor position. Indeed, Blankinship has worked as a conductor for approximately 10 years without incident, and a jury could reasonably find that he has the general qualifications, experience, and abilities to work as a conductor. (PSSF 37) *See Equal Employment Opportunity Commission v. BNSF Railway Company*, -- F.3d --, 2018 WL 4100185, *10 (9th Cir. Aug 29, 2018) (holding that an employer could not credibly deem an employee otherwise unqualified for a position when it conditionally offered him employment, he was working in a similar position at the time of his application, and he was cleared to work by medical doctors who examined him).

Instead, Union Pacific argues that Blankinship fails to meet a job-related qualification standard – i.e. being capable of passing an Ishihara color vision test or Union Pacific's proprietary Light Cannon test. However, whether Union Pacific's qualification standards requiring that conductors either pass the Ishihara color vision test or Union Pacific's own Light Cannon test to receive certification is job related or a matter of business necessity is not a question of qualification. Each of these questions are affirmative defenses for which Defendant carries the burden of proof at trial. *See Bates*, 511 F.3d at 992. For example, in *Bates*, the court rejected defendant's argument that plaintiffs were required to demonstrate that they were "safe" drivers even though they were hearing impaired because it would require the employee to disprove the employer's business necessity affirmative defense. *Id.* ("Because UPS has linked hearing with safe driving, UPS bears the burden to

prove that nexus as part of its defense to the use of hearing qualification standards.") As the Ninth Circuit there explained, "[t]he employee does not bear the burden to invalidate the employer's safety based qualification standard. Nor is the employee required to disprove [the defendant's] contention that, in order to be safe, the driver must pass the DOT hearing standard – the very qualification standard disputed in this case." *Id.*

As to the "essential function" step of the inquiry, there is a clear question of fact as to whether Blankinship could have performed the essential functions of his job with or without a reasonable accommodation. Essential functions are "fundamental job duties of the employment position . . . not including the marginal functions of the position." *Bates*, 511 F.3d at 990 (internal citation omitted). "Whereas 'essential functions' are basic 'duties,' . . . 'qualification standards' are 'personal and professional attributes that may include physical, medical [and] safety' requirements. . . . The difference is crucial." *Id.* (internal citation omitted). The ADA "does not require that a person meet each of an employer's established 'qualification standard,' however, to show that he is 'qualified.'" *Id.* As the Ninth Circuit has explained, "indeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly *cannot* meet because of his disability and that forms the very basis of his discrimination challenge." *Id.* (emphasis in original).

Prior to being removed from service, Blankinship performed his job as a conductor for approximately ten years without incident and without ever missing a signal. (PSSF 37.) On the occasion that he failed to pass the Ishihara color test in 2011, he demonstrated his ability to read real railroad wayside signals by passing Union Pacific's color vision field test with a perfect score. (PSSF 39.) This is sufficient to show that, absent Union Pacific's discriminatory color vision qualification standard, Blankinship would have been able to perform the functions of the Conductor job. *See e.g. Bates,* 511 F.3d at 994. In other words, to prove he is a qualified individual, Blankinship need not disprove the validity of the color vision standards upon which Union Pacific relied on to disqualify him, rather he need only

show that he has the physical capacity to perform the functions of the Conductor position. *Id.* at 992. At minimum, the record presents factual questions with respect to Blankinship's ability to perform the essential functions of his job. Indeed, Union Pacific here argues that Blankinship has no impairment that prevents him from any kind of life activities. (Def. Memorandum of Law at 23; DSSF 56-58). Blankinship, therefor, can establish the prima facie elements of his claim for disability, thereby precluding summary judgment on his ADA claims.

### 3. <u>Passing the Light Cannon Test is not a Valid Job Related Qualification Standard.</u>

Where an employer "asserts a blanket safety-based qualification standard - beyond the essential job function – that is not mandated by law and that qualification standard screens out or tends to screen out an individual with a disability, the employer - not the employee – bears the burden of showing that the higher qualification standard is job-related and consistent with business necessity, and that performance cannot be achieved through reasonable accommodations." *Bates*, 511 F.3d at 992-93; *Littlefield v. Nev. ex rel. Dep't of Pub Safety*, 195 F.Supp.3d 1147, 1156 (D.Nev. 2016). Defendant relies on the existence of FRA regulations mandating color vision testing as a defense for its facially discriminatory color vision policies. In essence, Union Pacific has taken the position that the FRA's conductor certification requirement binds its hands and require it to decertify and remove from service any employee who falls short of its standards. However, because the center piece of Union Pacific's color vision certification policy – the Light Cannon test – does not comply with FRA rules and guidelines for the development and implementation of color vision tests, the applicable federal regulations do not render Union Pacific's policy job-related and do not excuse Defendant from liability under the ADA. This is false.

Although FRA regulations concerning the train conductor certification do mandate that railroads determine whether conductors have the visual acuity to recognize and distinguish colored railroad signals, the regulations give the railroads discretion to

determine which approved testing procedures to utilize and what form of subsequent testing to use where an employee fails the initial test. (PSSF 1, 3.) As the FRA explains, "[t]here are many types of eye conditions and visual disturbances ranging in severity from very mild to severe and many types and designs of railroad signals and railroad operating rules." (PSSF 2.) As such, the FRA regulatory scheme regarding color vision testing is not a rigid set of requirements, and the manner through which Union Pacific certifies and decertifies conductors is a decision left with the company. (PSSF 1-3.) For example, while the FRA provides a list of acceptable tests to prove threshold color vision capacity, it does not dictate which tests railroads implement. (PSSF 1.) Further, while it requires that conductors be allowed to undergo additional testing upon request if they fail a threshold assessment, the FRA leaves the development of the subsequent testing process to the railroad, and merely states that such testing should take the form of ophthalmological referral, field testing, or other practical color testing. (PSSF 3.) In short, while the FRA requires color vision testing as a part of conductor certification, a jury could reasonably find that Union Pacific's color vision policies are its own and that the FRA does not act as a shield.

Further, while the FRA does not mandate specific testing policies, it has established minimum standards for field and scientific tests railroads use to perform subsequent testing. Specifically, the FRA requires that tests be "valid, reliable, and comparable." (PSSF 5-6, 8.) According to the FRA, "validity" is "the degree to which a test actually measures what the test is intended to measure." (PSSF 9.) Validation of a test is important both to maximize the detection of individuals whose color vision is insufficient to perform their job *and* to ensure that people who are able to discriminate colored signals are not incorrectly screened out. (PSSF 14.) The FRA issued these guidelines concerning minimum standards partially in response to requests for clarification of the of applicable regulatory provisions and to requests for review when individuals are removed from service based on railroad color vision testing. (PSSF 7.)

MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1    Here, a jury will likely find that Union Pacific's Light Cannon test failed to meet
2  FRA minimum validation standards and, even, that the test and protocol were invalid. First,
3  despite Union Pacific's decision to employ experts in color vision testing procedures to
4  perform initial validation studies, Union Pacific declined to follow their recommendations
5  that the Light Cannon undergo additional scientific and operations validation studies.
6  (PSSF 23) The report issued to Union Pacific by Dr. Rabin and Dr. Ivan following their
7  evaluation of the Light Cannon stated unequivocally that the test in its then current form
8  was not ready to be implemented as a device to assess employees color visions, and that,
9  in addition to several hardware changes, the test should have undergone further rigorous
10  validation. (PSSF 21-22). Despite these recommendations, Union Pacific began using the
11  Light Cannon to test employees in April 2016 without subjecting it to any additional
12  validation efforts. (PSSF 23-24). As such, the Light Cannon test did not meet FRA
13  minimum standards when it was initially rolled out for use.

14    By the time Blankinship was assessed the Light Cannon test and removed from
15  service, Union Pacific still had not completed any validating studies. (PSSF 25-27) Further,
16  while the physical test device was not changed from its form in April 2016, the protocols
17  for the assessment of the test remained in flux. (PSSF 27). While Union Pacific argues that
18  the FRA, via its certification review board, has determined that the Light Cannon complies
19  with FRA standards, there is no evidence in the record that the FRA ever completed an
20  evaluation or the test or produced any assessment of its validity. (Pl.'s Response to DSSF
21  34-36.)

22    Most damningly, in 2019, Union Pacific's sole disclosed expert witness, Dr.
23  Rabin, conducted the first study of the Light Cannon test on individuals with normal color
24  vision. (PSSF 13, 28-29). The study determined that, under the then current protocols, the
25  test had a 26.5 percent false fail rate among so called color vision normal subjects. (PSSF
26  29-30) Dr. Rabin himself testified that, based on these results, as of 2019, the Light Cannon
27  was not a valid test. (PSSF 34.)

28

1   Defendant relies on *Brunskill v. Kansas City Southern Railway Co* to suggest that

2   the railroad is entitled to substantial deference in the application of color vision testing

3   policies. 2008 WL 413281 (W.D. Mo. Feb. 12, 2008). This argument is unavailing,

4   however, because the decision in *Brunskill* predates the 2015 issuance of the FRA's

5   guidance concerning color vison tests. *Id.* There, the FRA had not yet instituted the

6   requirement that color vision testing be valid, reliable, and comparable, and as such, the

7   court deferred to the determination of the railroad's chief medical officer alone. *Id.* at \*29.

8   Because the test that Blankinship was assessed in 2017 was same as the invalid

9   Light Cannon evaluated by Dr. Rabin, a jury could reasonably find that Union Pacific

10  removed Blankinship from service and issued him permanent work restriction on the basis

11  of a test that violated FRA standards. (PSSF 27, 29-34) As such, Union Pacific's claim that

12  its color vision testing and qualification policy is a work-related qualification standard

13  required by federal regulations fails.

14  **4. Because Union Pacific's Light Cannon Test Does Not Meet FRA Requirements**
15  **Regarding Validation, Union Pacific's Action was not Necessitated by Federal**
    **Law or Regulation.**

16  Similarly unavailing is Union Pacific's argument that, under *Albertson's, Inc. v.*

17  *Kirkinburg* Defendant enjoys a complete defense because its actions were necessitated by

18  Federal law or regulation. 55 U.S. 555 (1999). *Kirkinburg* is distinguishable on multiple

19  points.[2] First, unlike the FRA policy here, which grants Union Pacific discretion in

20  developing its color vison testing policy, the *Kirkinburg* concerned a set of firm

21  Department of Transportation qualification standards for commercial truck drivers. *Id.* at

22  559. The DOT regulatory scheme required that, in order to be qualified, a driver must meet

23  the DOT's standards for visual acuity. *Id.* at 570.

24

25

---

26  [2] Court in the Ninth Circuit have also cast doubt on the applicability of *Kirkinburg*
    generally, as there, the Supreme Court assessed the ADA prior to the 2009 ADAAA. *See*
27  *Goldstein v. FedEx Freight, Inc.*, U.S. Dist. LEXIS 185258, \*13-14 (W.D. Wa. Oct. 24,
    2019) ("But *Kirkinburg* is old law that has been repudiated by the legislative history of
28  updates to the ADAAA[.]")

19

There, the plaintiff was an employee of defendant Albertsons who was deprived a position as a commercial truck driver based on the defendant's application of the DOT policies. *Id.* at 526-27. The plaintiff did not challenge the validity of the regulations, instead arguing that the employer should have accepted an experimental waiver program that would have allowed the plaintiff to receive DOT certification. *Id.*575. The Court determined that the waiver program did not modify the DOT's general visual acuity standards and the employer was entitled to rely on the DOT standards as written. *Id.* at 574, 77. Similarly, in *Bey v. City of New York*, employee firefighters argued that they were entitled to an accommodation in their use of personal protective equipment. 999 F.3d 157 (2nd Cir. 2021). There, the court determined that "binding OSHA regulation" concerning the length of facial hair that may be worn with the equipment directly prohibited the requested accommodation. *Id.* at 167. As such, the employer was entitled to rely on the OSHA binding standards. *Id.* at 168.

Here, unlike in *Albertsons* and *Bey*, a jury could determine that, by providing the railroad discretion in developing tests with only minimum standards, the FRA conductor certification guidelines did not mandate specific qualification requirements. As such, Union Pacific cannot claim, as in *Albertsons*, that it was permitted to rely entirely the regulatory system as a shield. The Light Cannon and the policies around it are Union Pacific's creation, and given that they fall short of the FRA's minimum standards for validity, a jury could determine that it is liable for discriminatory actions taken thereunder.

## D. FACT ISSUES PRECLUDE JUDGEMENT ON PLAINTIFF'S DISPARATE IMPACT CLAIM.

The ADA also prohibits "using qualification standards, employment tests, or other selection criteria that screen out or tend to screen out an individual with a disability[.]" 42 U.S.C. § 12112(b)(6). Qualification standards include "medical, safety and other requirements established by [an employer] as requirements [] to be eligible for the position held[.]" 29 C.F.R. § 1630.2(q). An employer may only use a standard, test, or selection

MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

criteria if it is shown to be job related and consistent with business necessity. 42 U.S.C. § 12112(b)(6).

As a preliminary matter, Union Pacific's argument that Blankinship is not disabled within the meaning of the ADA is contrary to the plain language of the statute. The term "disability" is limited to actual physical or mental impairments, but explicitly includes "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(C). As the statute explains: "An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an **actual or perceived** physical or mental impairment whether or not the impairment limits of is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(a) (effective January 1, 2009)(emphasis added) *see Littlefield¸*195 F.Supp. 3d 1147, 1154 (D.Nev. 2016) ("As the Ninth Circuit has reasoned '[i]t offends the ADA as much for a person to be 'regarded as' having a disability, as actually to have one. This is because people should not be rejected on account of myths or stereotypes.'") *citing EEOC v. UPS*, 306 F.3d 794 (9th Cir. 2002). This definition of "disability" applies to claims under both 42 U.S.C. § 12112(a) and 42 U.S.C. § 12112(b)(6). 42 U.S.C. § 12102 ("As used in this chapter . . . the term disability means . . .").

By comparing "actual and perceived" impairments, congress intended to allow for protection for individuals who both were treated as more impaired than actually are and for individual who are mistakenly treated as having an impairment. Here, as discussed above, Dr. Holland and Union Pacific perceived Blankinship as having "color vision deficit" that prevented him from discerning colored signals. (PSSF 40-42) Whether Blankinship himself considered himself a person with a disability is immaterial – the question is whether Union Pacific perceived him as such and whether its policies had the tendency of screening him. Based on facts in the record, a jury could reasonably find that the answer to both questions was "yes."

1    **1.   <u>Union Pacific Cannot Prove its Affirmative Defense of Business Necessity.</u>**

2    Because Union Pacific's fitness-for-duty policy concerning color vision unlawfully

3    screens out disabled applicants, the company has the burden of proving that the standard

4    satisfies the business necessity defense. *See Cripe v. City of San Jose*, 261 F.3d 877, 890

5    (9th Cir. 2001) (internal citations omitted). "The 'business necessity' standard is quite high,

6    and 'is not [to be] confused with mere expediency.'" *Id.* (quoting *Bentivegna v. United*

7    *States Dep't of Labor*, 694 F.2d 619, 621-22 (9th Cir. 1982)) (alteration in original). In the

8    Ninth Circuit, the business necessity defense is rarely established and courts have "had

9    little occasion to apply [the defense]." *Cripe*, 261 F.3d at 890 (quoting *Yin v. California*,

10   95 F.3d 864, 868 (9th Cir. 1996)).

11   For the reasons stated above, Union Pacific cannot meet its burden of proving that

12   its policy that conductors who are unable to pass the Ishihara 14-plate test must pass the

13   company's Light Cannon test was job related and consistent with business necessity, and

14   that no reasonable accommodation is possible to overcome it. First, to show job-

15   relatedness, "an employer must demonstrate that the qualification standard fairly and

16   accurately measures the individual's *actual ability* to perform the essential functions of the

17   job." *Bates*, 511 F.3d at 996 (citing *Cripe*, 261 F.3d at 890) (emphasis added). Second, to

18   show that the qualification standard is consistent with business necessity, "the employer

19   must show that it *substantially promote[s]* the business's needs." *Id.* (internal quotation

20   marks and citation omitted) (emphasis added). Finally, to show that "performance cannot

21   be accomplished by reasonable accommodation," Defendant must show that either no

22   reasonable accommodation currently available would cure the deficiency, or that any such

23   accommodation would pose an "undue hardship" on the company. *Id.* at 996-97.

24   With respect to job-relatedness, because the Light Cannon test fails to meet FRA

25   validation requirements, and, indeed, was demonstrated to have a significant rate of false

26   failures for individuals with normal color vision, Union Pacific cannot reasonably prove

27   that the Light Cannon test accurately measures an employee's actual ability to perform the

28

1    job's essential functions. (PSSF 27, 29-35). Although Union Pacific relies entirely on the

2    existence of FRA color vision regulations to support it's color vision protocols, the Light

3    Cannon test and Union Pacific's Fitness-for-Duty policy are internally developed and not

4    mandated by the FRA (PSSF 3, 15) *See Bates*, 511 F.3d at 998 (internal citation omitted)

5    (determining that a governmental regulation that does not specifically apply to the position

6    at issue is not dispositive of job-relatedness or business necessity).

7         Defendant also fails to show that its use of the Light Cannon test substantially

8    promotes its needs. As discussed above, Union Pacific is under no legal obligation to

9    require conductors to pass the Light Cannon test – the test, in fact, lacks the FRA required

10   validity for a field test and is inconsistent with any regulation or regulatory guidance. *See*

11   *Rohr v. Salt River Project Agriculture Imp. and Power Dist.*, 555 F.3d 850, 863 (9th Cir.

12   2009) ("This is not a case where an employer merely implemented the medical certification

13   program required by a federal agency . . . Salt River has failed to show the necessity of *the*

14   *particular* [criteria] that it used in the evaluation, or the absence of any alternative [criteria]

15   appropriate[.]"). Like the defendant in *Salt River*, Union Pacific has neither followed a

16   standard required of it by any regulation, nor has it articulated why this *particular* standard

17   was necessary, or the absence of a different, less discriminatory applicable evaluation

18   criteria.

19         Finally, Union Pacific offers no evidence to support its contention that no reasonable

20   accommodation existed. *See Bates*, 511 F.3d at 996-97.

21         Because Defendant cannot satisfy the components of the "business necessity"

22   defense, summary judgment is inappropriate on Blankinship's claim of unlawful screening

23   in violation of the ADA.

### III.  CONCLUSION

25         For the above reasons, Union Pacific's motion for summary judgement should be

26   denied.

27

28

1

2   Date: ___July 7, 2022_____          **HILDEBRAND, McLEOD & NELSON LLP**

3
                                         By: /s/ *Gavin S. Barney*_____
4                                        Anthony S. Petru* (CA #91399)
                                         petru@hmnlaw.com
5                                        Gavin S. Barney* (CA #321880)
                                         barney@hmnlaw.com
6                                        350 Frank H. Ogawa Plaza, 4th Floor
7                                        Oakland, California 94612
                                         Telephone: (510) 451-6732
8                                        Fax: (510) 465-7023

9

10                                       James H. Kaster* (MN #53946)
                                         kaster@nka.com
11                                       David E. Schlesinger (AZ #025224)
12                                       schlesinger@nka.com
                                         Lucas J. Kaster* (MN #396251)
13                                       lkaster@nka.com
14                                       **NICHOLS KASTER, PLLP**
                                         80 South Eighth Street
15                                       4700 IDS Center
16                                       Minneapolis, Minnesota 55402-2242
                                         Telephone: (612) 256-3200
17                                       Fax: (612) 338-4878

18                                       *admitted *pro hac vice*

19
                                         Attorneys for Plaintiff James Blankinship
20

21

22

23

24

25

26

27

28

MEMORANDUM OF LAW IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT