**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Blankinship, | No. CV-21-00072-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Union Pacific Railroad Company, | |
| Defendant. | |

Pending before the Court is Defendant Union Pacific Railroad Company's ("Defendant" or "Union Pacific") Motion for Summary Judgment. (Doc. 66.) Plaintiff James Blankinship ("Plaintiff" or "Blankinship") responded in opposition (Doc. 71), and Defendant replied (Doc. 76). For the following reasons, Defendant's Motion will be granted.

**I.  Facts**[1]

The Federal Railroad Administration ("FRA") issues regulations governing railroad conductors for the purpose of reducing accidents and improving railroad safety. (Doc. 68 at 2 ¶ 7; Doc. 72 at 2 ¶ 7.)[2] Defendant is required to comply with FRA regulations. (Doc. 68 at 2 ¶ 8; Doc. 72 at 2 ¶ 8.) FRA regulations require all railroad conductors to pass a vision acuity examination that tests an individual's ability to recognize and distinguish between the colors of railroad signals. (Doc. 68 at 2 ¶ 9; Doc.

---

[1] Unless otherwise stated, there is no genuine dispute concerning the facts recited herein.
[2] All record citations refer to the docket and page numbers generated by this Court's electronic filing system.

72 at 2 ¶ 9); *see also* 49 C.F.R. § 242.117(h)(3).  Railroads are required to determine that an individual meets FRA standards for visual acuity prior to certifying or recertifying the individual as a conductor.  49 C.F.R. § 242.117(b). The FRA has found that railroad employees with defective color vision have a higher relative error risk.  (Doc. 68 at 5 ¶ 26; Doc. 72 at 4 ¶ 26; *see also* Doc. 68-18 at 8.)[3]

FRA regulations identify the Ishihara (14 plate) test as an acceptable testing method for determining whether a person can recognize and distinguish between the colors of railroad signals.  (Doc. 68 at 2 ¶ 10; Doc. 72 at 2 ¶ 10; *see also* Doc. 68-15 at 51 (49 C.F.R. Pt. 242, App'x D(2)).)  If an individual does not successfully complete the Ishihara test or one of the other acceptable initial tests set forth in 49 C.F.R. Pt. 242, App'x D, the railroad must, on request, subject the individual to "further medical evaluation by [the] railroad's medical examiner to determine that person's ability to safely perform as a conductor."  49 C.F.R. § 242.117(j).  The further medical evaluation may include ophthalmologic referral or secondary testing using "another approved scientific screening test or a field test."  (Doc. 68-15 at 51 (49 C.F.R. Pt. 242, App'x D(4)).)[4]

In 1999, Defendant implemented a Color Vision Field Test ("CVFT") that presented examinees with ten wayside signal configurations and measured the accuracy and speed of examinees' identification of the signals.  (Doc. 68 at 3 ¶ 17; Doc. 72 at 3 ¶ 17.)  Defendant hired Plaintiff as a railroad conductor in 2007.  (Doc. 68 at 1 ¶ 1; Doc. 72 at 2 ¶ 1.)  Meeting FRA color vision standards was an essential part of Plaintiff's conductor job.  (Doc. 68 at 2 ¶ 5; Doc. 72 at 2 ¶ 5.)  Prior to 2017, Plaintiff underwent

---

[3] The Court grants Defendant's request (Doc. 70) to take judicial notice of the existence of the FRA's March 2015 final report entitled "Railroad Signal Color and Orientation: Effects of Color Blindness and Criteria for Color Vision Field Tests."  *See* Fed. R. Evid. 201; *Lee v. City of L.A.*, 250 F.3d 668, 689-90 (9th Cir. 2001).  It also appears the report could be presented at trial in admissible form under Federal Rule of Evidence 803(8).

[4] A field test "is a test performed outdoors under test conditions that reasonably match actual operating or working conditions."  80 Fed. Reg. 73122-01, 73124 (Nov. 24, 2015).  "A scientific vision test is a test instrument that, based on the results of a rigorous scientific study published in a peer-reviewed scientific or medical journal or other publication, is a valid, reliable, and comparable test for assessing whether a person has sufficient . . . color vision, which, for purposes o[f] railroad operations, allows the person to safely perform as a locomotive engineer or conductor."  *Id.*

Defendant's color-vision testing for FRA certification on three occasions: in 2007, 2011, and 2013.  (Doc. 68 at 7 ¶ 38; Doc. 72 at 6 ¶ 38.)  In 2011, Plaintiff failed the Ishihara (14 plate) test but passed Defendant's then-current version of the CVFT.  (Doc. 68 at 7 ¶ 38; Doc. 72 at 6 ¶ 38.)

In June 2012, two Union Pacific freight trains collided in Goodwell, Oklahoma, killing three people and causing approximately $14.8 million in damage.  (Doc. 68 at 3-4 ¶¶ 18-19; Doc. 72 at 3 ¶¶ 18-19.)  The National Transportation Safety Board ("NTSB") concluded that one of the probable causes of the collision was the inability of one of the train engineers to see and correctly interpret wayside signals.  (Doc. 68 at 4 ¶ 20; Doc. 72 at 3-4 ¶ 20; *see also* Doc. 68-17 at 52-53.)[5]  The NTSB recommended that Defendant replace its CVFT "with a test that has established and acceptable levels of validity, reliability, and comparability to ensure that certified employees in safety-sensitive positions have sufficient color discrimination to perform safely."  (Doc. 68-17 at 30; *see also* Doc. 68 at 4 ¶¶ 22-23; Doc. 72 at 4 ¶¶ 22-23.)

Partially in response to the Goodwell collision, the FRA published in the Federal Register an interim interpretation entitled "Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors."  (Doc. 68 at 5 ¶¶ 27-28; Doc. 72 at 4 ¶¶ 27-28); *see also* 80 Fed. Reg. 73122-01.  The FRA's Best Practices interpretation notes that railroads have discretion in selecting secondary test protocols but that "the test offered by a railroad must be a valid, reliable, and comparable test for assessing whether a person who fails an initial vision test can safely perform as a locomotive engineer or conductor."  80 Fed. Reg. at 73124.  "Validity means the degree to which a test actually measures what the test is intended to measure[,] . . . [r]eliability means the degree of reproducibility of the test results," and "[c]omparability means the testing procedures are fairly administered and the test results are uniformly recorded."  *Id.* at 73125.  The Best Practices interpretation also sets forth "broadly drafted" industry best practices for

---

[5] The Court grants Defendant's request (Doc. 70) to take judicial notice of the existence of the NTSB's report regarding the Goodwell collision.  *See* Fed. R. Evid. 201; *Lee*, 250 F.3d at 689-90.  It also appears the report could be presented at trial in admissible form under Federal Rule of Evidence 803(8).

conducting color vision field testing. *Id.* at 73126-73128.

After the NTSB investigation of the Goodwell collision and the FRA's issuance of the Best Practices interpretation, Defendant implemented a revised CVFT known as the Light Cannon test. (Doc. 68 at 5-6 ¶¶ 30-31, 33; Doc. 72 at 4-5 ¶¶ 30-31, 33.) The parties dispute whether the FRA has determined that the Light Cannon test satisfies FRA requirements as a valid, reliable, and comparable test. (Doc. 68 at 6 ¶¶ 34-36; Doc. 72 at 5 ¶¶ 33-36; *see also* Doc. 72 at 11-14 ¶¶ 20-35.)

On January 3, 2017, Plaintiff failed the Ishihara (14 plate) test administered as part of the process for FRA recertification as a conductor. (Doc. 68 at 7 ¶ 39; Doc. 72 at 6 ¶ 39.) On January 12, 2017, Plaintiff failed Defendant's Light Cannon test. (Doc. 68 at 7 ¶ 41; Doc. 72 at 6 ¶ 41.) Defendant's chief medical officer reviewed the results of Plaintiff's failed Ishihara and Light Cannon tests, concluded that Plaintiff did not meet FRA certification requirements for his conductor position and, on January 19, 2017, issued Plaintiff a Notification of FRA Certification Denial. (Doc. 68 at 7 ¶ 42; Doc. 72 at 6 ¶ 42.) Defendant issued Plaintiff permanent work restrictions prohibiting him from working in any position requiring accurate identification of colored railroad wayside signals. (Doc. 68 at 8 ¶ 44; Doc. 72 at 6 ¶ 44.) On February 16, 2017, at the request of Plaintiff's union representative, Defendant administered to Plaintiff a second Light Cannon test. (Doc. 68 at 8 ¶¶ 45-46; Doc. 72 at 6 ¶¶ 45-46.) Plaintiff failed the second Light Cannon test. (Doc. 68 at 8 ¶ 46; Doc. 72 at 8 ¶ 46.) On March 9, 2017, Defendant's chief medical officer again issued Plaintiff a Notification of FRA Certification Denial. (Doc. 68 at 8-9 ¶ 47; Doc. 72 at 6 ¶ 47.) Plaintiff did not appeal or contest the second Light Cannon test or the results thereof. (Doc. 68 at 9 ¶ 49; Doc. 72 at 6 ¶ 49.) Plaintiff has not been certified as a conductor under FRA standards since his removal from service in January 2017. (Doc. 68 at 9 ¶ 50; Doc. 72 at 6 ¶ 50.)

As this Court has previously recognized, Plaintiff was a putative ADA class member in *Harris v. Union Pacific Railroad Company*, No. 8:16-cv-381 (D. Neb.), a class action commenced in February 2016 by Union Pacific employees alleging disability

discrimination. (Doc. 31 at 2; *see also* Doc. 13 at 3-4 ¶¶ 4-5, 11-12; Doc. 67 at 3.) The complaint in *Harris* raised class claims for disparate treatment, disparate impact, and unlawful medical inquiry under the Americans with Disabilities Act ("ADA"). (Doc. 68 at 9 ¶ 51; Doc. 72 at 6 ¶ 51; *see also* Doc. 68-26 at 21-24.)[6] On August 17, 2018, the *Harris* plaintiffs moved for class certification on the disparate treatment claim only, stating the operative class definition as: "All individuals who have been or will be subject to a fitness-for-duty examination as a result of a reportable health event at any time from September 18, 2014 until the final resolution of this action." (Doc. 68 at 9 ¶¶ 52-53; Doc. 72 at 6-7 ¶¶ 52-53; *see also* Doc. 68-27 at 2; Doc. 73-15 at 22.) On February 5, 2019, the *Harris* court certified the class as defined in the motion for class certification. *Harris v. Union Pac. R.R. Co.*, 329 F.R.D. 616, 628 (D. Neb. Feb. 5, 2019).[7] Defendant's Medical Rules—incorporated by reference into the *Harris* complaint—define a "reportable health event" in relevant part as "a new diagnosis, recent event, or change in a prior stable condition for . . . [s]ignificant vision change in one or both eyes affecting . . . color vision." (Doc. 68 at 10 ¶¶ 54-55; Doc. 72 at 7 ¶¶ 54-55; *see also* Doc. 68-26 at 4-5, 44.) Blankinship did not experience an event of significant vision change in one or both eyes affecting color vision at any time during his Union Pacific employment. (Doc. 68 at 10 ¶ 57; Doc. 72 at 7 ¶ 57.)

On April 10, 2020, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Doc. 68 at 10 ¶ 59; Doc. 72 at 7 ¶ 59.) Plaintiff initiated this action on February 10, 2021 (Doc. 1) and, on March 24, 2021, filed a three-count First Amended Complaint ("FAC") alleging ADA violations (Doc. 13). On August 2, 2021, the Court dismissed as time-barred the failure-to-accommodate claim alleged in Count Three of the FAC. (Doc. 31.) The remaining claims in this action are Count One of the FAC, alleging disparate treatment in violation of 42 U.S.C. §

---

[6] The Court grants the requests of Defendant (Doc. 70) and Plaintiff (Doc. 74) to take judicial notice of relevant filings in the *Harris* case. *See* Fed. R. Evid. 201; *Lee*, 250 F.3d at 689-90.
[7] On March 24, 2020, the Eighth Circuit Court of Appeals reversed the district court's class certification. *Harris v. Union Pac. R.R. Co.*, 953 F.3d 1030 (8th Cir. 2020).

- 5 -

12112(a), and Count Two alleging disparate impact in violation of 42 U.S.C. § 12112(b)(3) and (b)(6). (Doc. 13 at 7-10.)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *see also Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In evaluating a motion for summary judgment, the court must "draw all reasonable inferences from the evidence" in favor of the non-movant. *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002). If "the evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to trial." *Id.* "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

## III. Discussion

In its Motion for Summary Judgment, Defendant argues that Plaintiff's remaining

claims are time-barred and that they fail on the merits. (Doc. 67.) For the following reasons, the Court finds that Plaintiff's claims are time-barred. The Court therefore declines to address the parties' arguments concerning the merits of the claims.

A plaintiff must timely exhaust his administrative remedies before filing an ADA suit by first filing an EEOC charge of discrimination. *See* 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a) (establishing that the procedures set forth in 42 U.S.C. § 2000e-5 apply to charges under the ADA). Absent tolling, the EEOC charge of discrimination must be filed within 300 days from the employer's alleged discrete employment act. 42 U.S.C. § 2000e-5(e)(1); 42 U.S.C. § 12117(a); *Rush-Shaw v. USF Reddaway, Inc.*, No. CV 12–0941–PHX–JAT, 2013 WL 3455723, at *3 (D. Ariz. July 9, 2013). However, "the commencement of [an] original class suit tolls the running of the statute [of limitations] for all purported members of the class" until class certification is denied. *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974); *Crown, Cork & Seal, Co. v. Parker*, 462 U.S. 345, 354 (1983). Class action tolling satisfies the policies underlying statutory limitation periods—namely, "ensuring essential fairness to defendants and . . . barring a plaintiff who has slept on his rights"—because the commencement of the class suit notifies the defendants, within the limitation period, of not only "the substantive claims being brought against them" but also "the number and generic identities of the potential plaintiffs who may participate in the judgment." *Am. Pipe*, 414 U.S. at 554-55 (internal quotation marks omitted). Because the defendant is alerted within the limitations period "of the need to preserve evidence and witnesses respecting the claims of all the members of the class," tolling "creates no potential for unfair surprise." *Crown, Cork & Seal*, 462 U.S. at 353.

Defendant does not dispute, for purposes of summary judgment, that the statute of limitations on Plaintiff's remaining ADA claims was tolled until the *Harris* plaintiffs moved for class certification. (Doc. 67 at 3.) However, Defendant argues that *American Pipe* tolling ceased on August 17, 2018, when the *Harris* plaintiffs moved for class certification on the disparate treatment claim only and proffered a class definition that

excluded Plaintiff. (*Id.* at 3-10.) In response, Plaintiff argues that both of his remaining ADA claims are subject to *American Pipe* tolling because the *Harris* complaint asserted disparate treatment and disparate impact claims under the ADA and the *Harris* class included individuals removed from service for color vision deficiency following a failed Light Cannon test. (Doc. 71 at 4-11.)

The Tenth Circuit Court of Appeals has held that when plaintiffs assert in a motion for class certification a definition of the class that is narrower than required by their complaint, the narrower definition controls for purposes of *American Pipe* tolling. *Sawtell v. E.I. du Pont de Nemours & Co.*, 22 F.3d 248, 253-54 (10th Cir. 1994). The Fourth Circuit Court of Appeals has similarly held "that when a plaintiff moves for class certification by asserting an unambiguous definition of his desired class that is more narrow than is arguably dictated by his complaint, his asserted class for tolling purposes may be limited to that more narrow definition," and *American Pipe* tolling will be unavailable for parties outside the asserted class. *Smith v. Pennington*, 352 F.3d 884, 894 (4th Cir. 2003). The Ninth Circuit has cited *Sawtell* favorably, *see In re Syntax Corp. Sec. Litig.*, 95 F.3d 922, 936 (9th Cir. 1996), but has not addressed the precise issue of whether a motion for class certification may narrow a class for purposes of *American Pipe* tolling.

The *Harris* complaint focused on fitness-for-duty evaluations triggered by reportable health events. (*See* Doc. 68-26 at 4-8.) The complaint alleged a class consisting of individuals who were removed from service and/or suffered another adverse employment action for reasons related to a fitness-for-duty evaluation. (*Id.* at 17.) Arguably, that putative class was broad enough to encompass Blankinship, despite the complaint's focus on fitness-for-duty evaluations triggered by reportable health events. However, the *Harris* plaintiffs' August 17, 2018 motion for class certification made clear that the intended class consisted only of those individuals "subject to a fitness-for-duty examination as a result of a reportable health event." (Doc. 68 at 9 ¶ 53; Doc. 72 at 6-7 ¶ 53; *see also* Doc. 68-27 at 2; Doc. 73-15 at 22.) Blankinship did not experience a change

in his color vision that would fall under the definition of a "reportable health event." (Doc. 68 at 10 ¶¶ 54-55, 57; Doc. 72 at 7 ¶¶ 54-55, 57.) He was subjected to Defendant's color-vision testing procedures not as a result of a reportable health event but, rather, as part of the FRA recertification process. (Doc. 68 at 7 ¶ 39; Doc. 72 at 6 ¶ 39.)[8] Accordingly, there is no genuine dispute that Blankinship was not included in the class definition set forth in the *Harris* plaintiffs' motion for class certification. Accordingly, under the reasoning of *Sawtell* and *Smith*, tolling ended upon the filing of the motion for class certification on August 17, 2018. After that date, Plaintiff had no reason to assume his rights were being protected by the *Harris* class action, and Defendant had no reason to believe that plaintiffs who were not subject to fitness-for-duty evaluations as a result of reportable health events might participate in the *Harris* judgment. Plaintiff did not file an EEOC charge of discrimination within 300 days of the filing of the motion for class certification in *Harris*. Accordingly, his ADA claims are time-barred.[9]

The Court also finds that *American Pipe* tolling ceased with respect to Plaintiff's disparate impact claim when the *Harris* plaintiffs voluntarily abandoned that claim in their August 17, 2018 motion for class certification. *See Smithson v. Union Pac. R.R. Co.*, __ F. Supp. 3d __, 2022 WL 1506288, at *3 (W.D. Tex. May 11, 2022) ("Once the

---

[8] As Plaintiff notes (Doc. 71 at 7), the *Harris* court issued an Order on February 1, 2019 allowing discovery related to Defendant's color vision testing procedures, finding that the allegations of the plaintiffs' complaint encompassed vision testing (Doc. 73-16 at 3-8). But Defendant does not dispute that the *Harris* class included individuals who were subjected to vision-related fitness-for-duty examinations. (*See* Doc. 76 at 3.) The issue is whether the class included individuals, like Blankinship, who were subjected to Defendant's color vision testing procedures as part of an FRA recertification process rather than as a result of a reportable health event.

[9] The Southern District of New York has found that a motion for class certification cannot trigger the end of *American Pipe* tolling, reasoning based on case law from the Second Circuit Court of Appeals that tolling continues until members of the asserted class opt out or a certification decision excludes them. *Choquette v. Cty. of N.Y.*, 839 F. Supp. 2d 692, 699-702 (S.D.N.Y. 2012) (citing *In re Worldcom Sec. Litig.*, 496 F.3d 245, 255 (2d Cir. 2007)). Even assuming that the Ninth Circuit would reject *Sawtell* and *Smith* and instead hold, consistent with *Choquette*, that the actions of class counsel cannot trigger the end of *American Pipe* tolling, the *Harris* court certified the class as defined in the plaintiffs' motion for class certification—thereby issuing a class certification decision that unambiguously excluded Blankinship—on February 5, 2019. *Harris*, 329 F.R.D. at 628. Therefore, as of February 5, 2019 at the latest, Blankinship had no reason to believe his rights were being protected by the *Harris* class action. Blankinship did not file an EEOC charge of discrimination within 300 days of the *Harris* court's February 5, 2019 class certification decision.

*Harris* Plaintiffs moved only to certify the disparate-treatment claim, the putative class members . . . had no reason to assume that their rights were being protected as to any other ADA-related claim."); *Carrillo v. Union Pac. R.R. Co.*, No. EP-21-CV-00026-FM, 2021 WL 3023407, at *4-6 (W.D. Tex. July 16, 2021) (finding tolling ended on putative class members' individual disparate impact claims when *Harris* plaintiffs moved to certify only the disparate treatment claim); *Fulbright v. Union Pac. R.R. Co.*, No. 3:20-CV-2392-BK, 2022 WL 625082, at *6 (N.D. Tex. Mar. 2, 2022) (finding ADA "unlawful medical inquiry claim was no longer tolled under the *Harris* class action once the named plaintiffs in that suit voluntarily abandoned" that claim "before moving to certify the class").

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 66) is **granted**. The remaining claims in this action—Plaintiff's ADA disparate treatment and disparate impact claims asserted in Counts One and Two of the First Amended Complaint—are **dismissed with prejudice as time-barred**. The Clerk of Court is directed to enter judgment in favor of Defendant and close this case.

Dated this 2nd day of September, 2022.

_____
Honorable Rosemary Márquez
United States District Judge