**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| James Blankinship, | No. CV-21-00072-TUC-RM |
| Plaintiff, | **ORDER** |
| v. | |
| Union Pacific Railroad Company, | |
| Defendant. | |

In this action, Plaintiff James Blankinship asserts violations of the Americans with Disabilities Act ("ADA") arising from Defendant Union Pacific Railroad Company's removal of him from service as a train conductor for failure to pass color vision testing. (Doc. 13). On August 2, 2021, the Court dismissed the failure-to-accommodate claim alleged in Count Three of Plaintiff's First Amended Complaint ("FAC"). (Doc. 31.) On September 6, 2022, the Court granted summary judgment to Defendant on the remaining disparate treatment and disparate impact claims asserted in Counts One and Two of the FAC, finding the claims time barred. (Doc. 78.) Plaintiff appealed this Court's summary judgment ruling (Doc. 92), and the Ninth Circuit Court of Appeals reversed and remanded in light of intervening authority, *DeFries v. Union Pacific Railroad Company*, 104 F.4th 1091, 1095 (9th Cir. 2024) (Doc. 96).

In its previously filed Motion for Summary Judgment, Defendant argued not only that Plaintiff's claims were untimely but also that they fail on the merits. (Doc. 67 at 10-27.) Neither this Court nor the Ninth Circuit has yet to address Defendant's merits

arguments. On August 30, 2024, the Court provided the parties with an opportunity to submit supplemental briefs addressing any legal or factual developments relevant to those arguments. (Doc. 97.) The parties' supplemental briefing is complete (Docs. 98, 99), and the Court finds the matter appropriate for resolution without oral argument.

## I. Background[1]

The Federal Railroad Administration ("FRA") issues regulations governing railroad conductors for the purpose of reducing accidents and improving railroad safety. (Doc. 68 at 2 ¶ 7 (citing 49 C.F.R. § 242.1(a)); Doc. 72 at 2 ¶ 7.)[2] Defendant is required to follow and comply with FRA regulations. (Doc. 68 at 2 ¶ 8 (citing 49 C.F.R. § 242.3(a)); Doc. 72 at 2 ¶ 8.) The FRA requires conductors to receive and maintain certification pursuant to FRA requirements ("FRA certification"). (Doc. 72 at 2 ¶ 6.) To meet FRA certification requirements, railroad conductors must have "[t]he ability to recognize and distinguish between the colors of railroad signals[.]" 49 C.F.R. § 242.117(h)(3). Meeting FRA color vision standards is an essential part of the job of a conductor. (Doc. 68 at 2 ¶ 5; Doc. 72 at 2 ¶ 5.) If a conductor misreads or misses a railroad signal, catastrophic damage and injury could result. (Doc. 68 at 1-2 ¶ 2; Doc. 72 at 2 ¶ 2.) The FRA has found that railroad employees with defective color vision have a higher relative error risk. (Doc. 68 at 5 ¶ 26; Doc. 72 at 4 ¶ 26; *see also* Doc. 68-18 at 8.)[3]

Railroads are responsible for certifying and recertifying conductors in accordance with FRA-approved programs, and are required to determine that an individual meets FRA standards for visual acuity prior to certifying or recertifying the individual as a conductor. (Doc. 72 at 2 ¶ 6); 49 C.F.R. §§ 242.101(a)(3), 242.109(a)(2), 242.117(b). To demonstrate the ability to recognize and distinguish between the colors of railroad signals, an individual must successfully complete one of the tests set forth in the FRA regulations. 49 C.F.R. §

---

[1] Unless otherwise stated, there is no genuine dispute concerning the facts recited herein.
[2] All record citations refer to the docket and page numbers generated by this Court's electronic filing system.
[3] The Court grants Defendant's request (Doc. 70) to take judicial notice of the existence of the FRA's March 2015 final report entitled "Railroad Signal Color and Orientation: Effects of Color Blindness and Criteria for Color Vision Field Tests." *See* Fed. R. Evid. 201; *Lee v. City of L.A.*, 250 F.3d 668, 689-90 (9th Cir. 2001). It also appears the report could be presented at trial in admissible form under Federal Rule of Evidence 803(8).

242.117(h)(3). The Ishihara (14) plate test is one of the acceptable testing methods identified in the regulations. (Doc. 68 at 2 ¶ 10; Doc. 72 at 2 ¶ 10); 49 C.F.R. § 242, App'x D(2). If an individual fails to successfully complete one of the identified color vision acuity tests, the individual "shall, upon request, be subject to further medical evaluation by a railroad's medical examiner to determine that person's ability to safely perform as a conductor." 49 C.F.R. § 242.117(j). The further medical evaluation may include ophthalmologic referral or secondary testing using "another approved scientific screening test or a field test." 49 C.F.R. Pt. 242, App'x D(4). A scientific screening test is one which has been demonstrated to be "valid, reliable, and comparable" based on "the results of a rigorous scientific study published in a peer-reviewed scientific or medical journal or other publication." 80 Fed. Reg. 73122-01, 73124 (Nov. 24, 2015). A field test "is a test performed outdoors under test conditions that reasonably match actual operating or working conditions." *Id.*

In 1999, Defendant implemented a Color Vision Field Test ("CVFT") that presented examinees with ten wayside signal configurations and measured the accuracy and speed of examinees' identification of the signals. (Doc. 68 at 3 ¶ 17; Doc. 72 at 3 ¶ 17.) In June 2012, an eastbound Union Pacific freight train collided head-on with a westbound Union Pacific freight train in Goodwell, Oklahoma, killing three employees and causing an estimated $14.8 million in damage. (Doc. 68 at 3-4 ¶¶ 18-19; Doc. 72 at 3 ¶¶ 18-19.) The National Transportation Safety Board ("NTSB") investigated the collision and concluded that one of the probable causes was the inability of one of the train engineers to see and correctly interpret wayside signals. (Doc. 68 at 4 ¶ 20; Doc. 72 at 3-4 ¶ 20; *see also* Doc. 68-17 at 52-53.)[4] The NTSB recommended that Defendant replace its CVFT "with a test that has established and acceptable levels of validity, reliability, and comparability to ensure that certified employees in safety-sensitive positions have sufficient color discrimination to perform safely." (Doc. 68-17 at 30; *see also* Doc. 68 at 4 ¶¶ 22-23; Doc.

---

[4] The Court grants Defendant's request (Doc. 70) to take judicial notice of the existence of the NTSB's report regarding the Goodwell collision. *See* Fed. R. Evid. 201; *Lee*, 250 F.3d at 689-90. It also appears the report could be presented at trial in admissible form under Federal Rule of Evidence 803(8).

72 at 4 ¶¶ 22-23.)

Partially in response to the Goodwell collision, the FRA published in the Federal Register an interim interpretation entitled "Best Practices for Designing Vision Field Tests for Locomotive Engineers or Conductors." (Doc. 68 at 5 ¶¶ 27-28; Doc. 72 at 4 ¶¶ 27-28); 80 Fed. Reg. 73122-01. The FRA's Best Practices interim interpretation states that railroads have discretion in selecting secondary test protocols but that "the test offered by a railroad must be a valid, reliable, and comparable test for assessing whether a person who fails an initial vision test can safely perform as a locomotive engineer or conductor." 80 Fed. Reg. at 73124. "Validity means the degree to which a test actually measures what the test is intended to measure[,] . . . [r]eliability means the degree of reproducibility of the test results," and "[c]omparability means the testing procedures are fairly administered and the test results are uniformly recorded." *Id.* at 73125.

After the NTSB investigation of the Goodwell collision and the FRA's issuance of the Best Practices interpretation, Defendant implemented a revised CVFT known as the Light Cannon test. (Doc. 68 at 5-6 ¶¶ 30-31, 33; Doc. 72 at 4-5 ¶¶ 30-31, 33.) The parties dispute whether the Light Cannon test is an adequate field test. (Doc. 68 at 6 ¶¶ 34-36; Doc. 72 at 5 ¶¶ 33-36; *see also* Doc. 72 at 11-14 ¶¶ 20-35.)

Defendant hired Plaintiff as a railroad conductor in 2007. (Doc. 68 at 1 ¶ 1; Doc. 72 at 2 ¶ 1.) Prior to 2017, Plaintiff underwent Defendant's color-vision testing for FRA certification/recertification on three occasions: in 2007, 2011, and 2013. (Doc. 68 at 7 ¶ 38; Doc. 72 at 6 ¶ 38.) In 2011, Plaintiff failed the Ishihara (14 plate) test but passed Defendant's then-current version of the CVFT. (Doc. 68 at 7 ¶ 38; Doc. 72 at 6 ¶ 38.)

On January 3, 2017, Plaintiff failed the Ishihara (14 plate) test administered as part of the FRA conductor recertification process. (Doc. 68 at 7 ¶ 39; Doc. 72 at 6 ¶ 39.) On January 12, 2017, Plaintiff failed Defendant's Light Cannon test. (Doc. 68 at 7 ¶ 41; Doc. 72 at 6 ¶ 41.) Defendant's chief medical officer reviewed the results of Plaintiff's failed Ishihara and Light Cannon tests, concluded that Plaintiff did not meet FRA certification requirements for the conductor position, and issued Plaintiff a Notification of FRA

Certification Denial. (Doc. 68 at 7 ¶ 42; Doc. 72 at 6 ¶ 42.) Defendant then issued Plaintiff permanent work restrictions prohibiting him from working in any position requiring accurate identification of colored railroad wayside signals. (Doc. 68 at 8 ¶ 44; Doc. 72 at 6 ¶ 44.) On February 16, 2017, at the request of Plaintiff's union representative, Defendant administered to Plaintiff a second Light Cannon test. (Doc. 68 at 8 ¶¶ 45-46; Doc. 72 at 6 ¶¶ 45-46.) Plaintiff failed the second Light Cannon test. (Doc. 68 at 8 ¶ 46; Doc. 72 at 8 ¶ 46.) On March 9, 2017, Defendant's chief medical officer again issued Plaintiff a Notification of FRA Certification Denial. (Doc. 68 at 8-9 ¶ 47; Doc. 72 at 6 ¶ 47.)

The FRA allows individuals who believe they have been incorrectly denied certification or recertification to appeal the railroad's decision to the FRA's Operating Crew Review Board. *See* 49 C.F.R. § 242.501. However, Plaintiff did not appeal or contest the second Light Cannon test or the results thereof. (Doc. 68 at 9 ¶ 49; Doc. 72 at 6 ¶ 49.) Plaintiff has not been certified as a conductor under FRA standards since his removal from service in 2017. (Doc. 68 at 9 ¶ 50; Doc. 72 at 6 ¶ 50.)

**II.     Summary Judgment Standard**

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and to show (1) that the fact in contention is material, i.e., a fact "that might affect the outcome of the suit under the governing law," and (2) that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

return a verdict for the nonmovant. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 248-50 (1986); *see also Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In evaluating a motion for summary judgment, the court must "draw all reasonable inferences from the evidence" in favor of the non-movant. *O'Connor v. Boeing N. Am., Inc.*, 311 F.3d 1139, 1150 (9th Cir. 2002). If "the evidence yields conflicting inferences, summary judgment is improper, and the action must proceed to trial." *Id.* "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

**III.   Discussion**

The Court addresses, first, Defendant's argument, raised in its Supplemental Brief, that Plaintiff failed to appeal the portion of this Court's September 6, 2022 Summary Judgment Order that dismissed Plaintiff's disparate impact claim. (*See* Doc. 98 at 2-3.) The Court then considers the merits arguments raised in Defendant's original Motion for Summary Judgment. (*See* Doc. 67 at 10-27.)

**A. Post-Remand Claims**

"*American* Pipe tolling strikes a balance among the efficiency gains of class actions, the procedural due process rights of class-action plaintiffs, and the fair-notice rights of class-action defendants." *DeFries*, 104 F.4th at 1099. Given the similarity of the disparate impact and disparate treatment claims at issue, the class action in *Harris v. Union Pacific Railroad Company*, No. 8:16-cv-381 (D. Neb.), gave Union Pacific sufficient notice of the need to preserve evidence pertaining to putative class members' potential disparate impact claims. *Zaragoza v. Union Pac. RR Co.*, 606 F. Supp. 3d 427, 434-36 (W.D. Tex. 2022). Requiring Plaintiff to file an individual suit alleging a disparate impact claim prior to the Eighth Circuit's decertification of the *Harris* class would frustrate litigative efficiency and "encourage needlessly duplicative litigation." *Brasier v. Union Pac. RR Co.*, No. CV-21-00065-TUC-JGZ (MSA), 2023 WL 2754007, at *14 (D. Ariz. Mar. 31, 2023).

In his opening brief before the Ninth Circuit, Plaintiff stated that, although he had initially alleged that Defendant's "policies amounted to discrimination in violation of the ADA . . . because they had a disparate impact," he was "pursu[ing] only his disparate-treatment theory" on appeal. *Blankinship v. Union Pacific Railroad Co.*, No. 22-16849, Dkt. 24 at 14 n.1 (9th Cir. May 4, 2023). However, the Ninth Circuit's memorandum disposition reversed this Court's grant of summary judgment to Union Pacific in its entirety, without differentiating between the disparate impact and disparate treatment claims. (*See* Doc. 96-1.) Similarly, the Ninth Circuit in *DeFries* did not differentiate between the claims in holding that the plaintiff's claims were tolled between the filing of the *Harris* complaint and the Eighth Circuit's decertification of the class. *See* 104 F.4th at 1105-09.

Because the reasoning of *DeFries* applies to both Plaintiff's disparate treatment and disparate impact claims, and the Ninth Circuit reversed this Court's summary judgment decision in its entirety without distinguishing between the claims, the Court finds that it is appropriate to address the parties' arguments on the merits of both claims.

**B.  Qualified Individual**

Defendant argues that Plaintiff cannot show that he is qualified within the meaning of the ADA for purposes of establishing a prima facie claim of disability discrimination, because federal regulations prohibit Defendant from allowing Plaintiff to work as a conductor unless he is able to satisfy FRA color vision testing standards, and there is no dispute that Plaintiff failed to do so. (Doc. 67 at 11-18.) Plaintiff argues that a jury could find that he is a qualified individual because he worked as a conductor without incident and without missing a signal for approximately ten years. (Doc. 71 at 13-16.) Plaintiff further argues that Defendant's Light Cannon field test is a qualification standard; that Defendant bears the burden of proving that the qualification standard is job-related and consistent with business necessity; that a jury could determine the Light Cannon test is invalid under FRA standards; and that FRA regulations do not shield Defendant from liability because they give Defendant discretion to determine which testing procedures to

1   utilize. (*Id.* at 14-20.)

2   The ADA prohibits covered entities from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). To state a claim for violation of the ADA, an employee bears the burden of proving that he is (1) disabled within the meaning of the ADA, (2) that he is a "qualified individual with a disability," and (3) that he was discriminated against because of his disability. *Bates v. United Parcel Serv.*, Inc., 511 F.3d 974, 988 (9th Cir. 2007) (internal quotation marks omitted). An individual is "qualified" if he "satisfies the requisite skill, experience, education and other job-related requirements" of the position and "can perform the essential functions" of the position with or without reasonable accommodation. 29 C.F.R. § 1630.2(m); *see also* 42 U.S.C. § 12111(8).

Discrimination under the ADA includes "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity[.]" 42 U.S.C. § 12112(b)(6). Qualification standards are "personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). "Essential functions," in contrast, are the "fundamental job duties" of the position. 29 C.F.R. § 1630.2(n)(1). "Essential functions" and "qualification standards" are distinct. *Bates*, 511 F.3d at 990. The ADA requires an employee to prove that he can perform the essential functions of the job but does not require the employee to prove that he can meet each of the employer's qualification standards. *Id.* "[I]ndeed, it would make little sense to require an ADA plaintiff to show that he meets a qualification standard that he undisputedly *cannot* meet because of his disability and that forms the very basis of his discrimination challenge." *Id.*

An employer may lawfully exclude individuals who fail a test required by

Government regulations. *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 570 (1999). "However, when an employer asserts a blanket safety-based qualification standard— beyond the essential job function—that is not mandated by law and that qualification standard screens out or tends to screen out an individual with a disability, the employer . . . bears the burden of showing that the higher qualification standard is job-related and consistent with business necessity, and that performance cannot be achieved through reasonable accommodation." *Bates*, 511 F.3d at 992-93.

The Court recognizes that FRA regulations require railroads to certify and recertify conductors, and that the regulations grant the railroads discretion in evaluating individuals' color vision acuity for purposes of conductor certification. The Court further recognizes that Defendant developed the Light Cannon field test in house, and that the test is not specifically mandated by FRA regulations. "[B]ecause reliance on the Light Cannon is not required by federal regulations, its use may be subject to questions about its appropriateness[.]" *Mills v. Union Pac. R.R. Co.*, No. 1:22-CV-00143-DCN, 2024 WL 185246, at *11 (D. Idaho Jan. 16, 2024).

Nevertheless, the Court finds that Defendant is entitled to summary judgment because Plaintiff has offered nothing more than speculation that he is able to satisfy FRA color vision acuity standards for purposes of being certified as a conductor. There is no dispute that railroad conductors must be certified pursuant to FRA requirements and that meeting FRA color vision standards is an essential part of the job of a conductor. (Doc. 68 at 2 ¶¶ 5-6; Doc. 72 at 2 ¶¶ 5-6.) Defendant is prohibited by federal regulation from allowing an individual to work as a conductor if the individual cannot satisfy FRA color vision standards. (Doc. 68 at 2 ¶ 3; Doc. 72 at 2 ¶ 3.) Plaintiff's ability to satisfy FRA color vision acuity standards in the past is insufficient to establish a genuine dispute of fact as to whether he could satisfy those standards at the time he was removed from service in 2017 or at any time since then, as vision can change and deteriorate over time, and the FRA regulations require periodic reevaluation for purposes of conductor recertification. *See* 49 C.F.R. § 242.201(c). In 2017, when Plaintiff was removed from service, he failed the

Ishihara test and twice failed Defendant's Light Cannon field test as part of the FRA recertification process. (Doc. 68 at 7-8 ¶¶ 39, 41, 46; Doc. 72 at 6 ¶¶ 39, 41, 46.) Defendant's medical examiner twice determined that Plaintiff failed to satisfy FRA color vision standards. (Doc. 68 at 7-9 ¶¶ 42, 47; Doc. 72 at 6 ¶¶ 42, 47.) Plaintiff criticizes the accuracy of Defendant's Light Cannon field test, but he has not identified any evidence to show that he could pass any other scientific test or field test that evaluates color vision acuity. In contrast to *Walker v. Union Pacific Railroad Company*, No. 3:22-cv-01011-JR, 2023 WL 10354310, at *11 (D. Or. Dec. 18, 2023), here there is no evidence that Plaintiff could, at the time of his removal from service, satisfy FRA certification requirements by passing the Ishihara test or any of the other scientific tests set forth in the FRA regulations. Furthermore, despite his criticisms of the Light Cannon test, Plaintiff has presented no evidence that he could pass a different field test. There is no medical evidence—such as the results of an ophthalmologic examination—raising a genuine dispute as to whether Plaintiff has the ability to distinguish between colored railway signals despite his inability to pass the Ishihara test and the Light Cannon field test.

Because Plaintiff has not identified any evidence raising a genuine dispute as to whether he can satisfy FRA color vision standards so as to be certified as a conductor, and because satisfying FRA color vision standards and obtaining FRA certification is an essential function of the job of a conductor, Plaintiff cannot show that he is qualified within the meaning of the ADA so as to establish a prima facie discrimination claim. Accordingly, the Court will grant summary judgment to Defendant on Plaintiff's remaining claims, Counts One and Two of the FAC.

. . . .

. . . .

. . . .

. . . .

. . . .

. . . .

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (Doc. 66) is **granted**. The Clerk of Court is directed to enter judgment in favor of Defendant and close this case.

Dated this 19th day of December, 2024.

_____
Honorable Rosemary Márquez
United States District Judge